U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

2020 SEP -4  PM 3: 40

BY_____
DEPUTY CLERK

| | |
|---|---|
| TRACEY MARTEL,<br>ROBERT FRENIER,<br>BRIAN SMITH,<br>RAOUL BEAULIEU, and<br>MARY BEAUSOLEIL,<br><br>     **Plaintiffs,**<br><br>**v.**<br><br>JAMES C. CONDOS,<br>**In his official capacity as the**<br>**SECRETARY OF STATE OF**<br>**VERMONT,**<br><br>     **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 5:20-cv-131

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs Tracey Martel ("Martel"), Robert Frenier ("Frenier"), Brian Smith ("Smith"), Raoul Beaulieu ("Beaulieu"), and Mary Beausoleil ("Beausoleil") and, collectively with Martel, Frenier, Smith, and Beaulieu, ("Plaintiffs"), by their undersigned counsel, for their Complaint for Injunctive and Declaratory Relief ("Complaint") against James C. Condos, in his official capacity as the Secretary of State of Vermont ("Condos" or "Defendant"), state as follows:

## PARTIES AND JURISDICTION

1.      Martel is a natural person residing in Victory, Vermont. Martel is registered to vote in Victory, Vermont. Martel is the Town Clerk of Victory, Vermont and in that role is responsible for the administration of Victory's elections.

1

2.     Frenier is a natural person residing in Chelsea, Vermont. Frenier is registered to vote in Chelsea, Vermont. Frenier served as a member of the Vermont House of Representatives for the Orange-1 District from 2017 through 2018.

3.     Smith is a natural person residing in Derby, Vermont. Smith is registered to vote in Derby, Vermont. Smith has served as a member of the Vermont House of Representatives for the Orleans-1 District from 2017 through the present.

4.     Beaulieu is a natural person residing in North Hero, Vermont. Beaulieu has been a registered voter in the town of North Hero for 34 years.

5.     Beausoleil is a natural person residing in Lyndon, Vermont. Beausoleil is registered to vote in the town of Lyndon and previously served as a Justice of the Peace in Lyndon.

6.     Condos is a natural person residing in Vermont. Condos is the incumbent Secretary of State of Vermont and in this role is an officer of the Executive department of the government of Vermont.

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1343 because this action is brought to redress the deprivation of Plaintiffs' civil rights under color of State law and to secure relief for the protection of Plaintiffs' right to vote.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the sole Defendant resides in this District and because the events and omissions giving rise to this action occurred in this District.

## BACKGROUND

### THE U.S. CONSTITUTION AND VERMONT CONSTITUTION PROTECT "FULL VALUE" OF EACH CITIZEN'S VOTE FROM DILUTION

9.     The U.S. Constitution protects "the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). This right to vote "is more . . . than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. . . . It also includes the right to have the vote counted at full value without dilution or discount." *Id.* at 555 n.29 (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)). State laws that abridge their citizens' right to have the "full value" of their votes counted "without dilution or discount" violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. *See id.* at 555-56.

10.    The Constitution of the State of Vermont ("Vermont Constitution") likewise provides "[t]hat all elections ought to be free and without corruption," and provides "that all voters, having a sufficient, evident, common interest with, and attachment to the community, have a right to elect officers, and be elected into office, agreeably to the regulations made in this constitution." *See* Vt. Const., ch. I, art. 8.

11.    Fraudulently-cast ballots dilute the votes cast by honest citizens and thereby violate the constitutionally-protected rights of those citizens. *See,*

*e.g., Anderson v. United States*, 417 U.S. 211, 226-27 (1974); *Baker v. Carr*, 369 U.S. 186, 207 (1962).

<u>U.S. CONSTITUTION VESTS POWER TO SET TIME, PLACE AND MANNER OF ELECTIONS IN STATE LEGISLATURE; VERMONT CONSTITUTION FORBIDS DELEGATION OF LEGISLATIVE POWER TO EXECUTIVE BRANCH</u>

12.    The U.S. Constitution vests the power to determine "[t]he Times, Places and Manner of holding Elections for Senators and Representatives" in the legislature of each state. U.S. Const., art. I, § 4.

13.    The U.S. Constitution also vests in the state legislatures the power to determine the manner in which Electors are chosen to serve in the Electoral College and elect the President and Vice President. *See* U.S. Const., art. II, § 1.

14.    Under the Vermont Constitution, the "Supreme Legislative power" is vested in the Senate and House of Representatives, which together form the Vermont General Assembly. *See* Vt. Const., ch. II, § 2.

15.    The Vermont Constitution explicitly prohibits the delegation of legislative power to the executive or judicial branches of government, providing, "The Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others." Vt. Const., ch. II, § 5.

<u>EXTANT VERMONT LAW PROVIDES FOR ROBUST AND SECURE ABSENTEE VOTING</u>

16.    In Vermont, the Vermont General Assembly has exercised the power vested in it by the U.S. Constitution and provided a robust statutory scheme for the conduct of elections within the state. *See* 17 V.S.A. § 2101 *et seq.*

17.    Of particular note given the ongoing COVID-19 pandemic and the appurtenant disruption of regular business throughout Vermont and the United States ("Pandemic") are Vermont's provisions for early and absentee voting, 17 V.S.A. § 2531 *et seq.*

18.    Under existing Vermont law, a voter may request an early voter absentee ballot ("Absentee Ballot") by applying for an Absentee Ballot with the town clerk of the town in which they are registered to vote. *See* 17 V.S.A. § 2531(b)(1). Applications for an Absentee Ballot may be made in person, in writing or via telephone. *See* 17 V.S.A. § 2532(a)(1). A voter can authorize a family member, health care provider, or any other person to apply for an Absentee Ballot on their behalf. *See* 17 V.S.A. § 2532(a). An application may be made until the town clerk's office closes on the day before the election. 17 V.S.A. § 2531(a)(1). Once a valid application is made, voters generally receive their Absentee Ballot by mail or by picking them up from the town clerk's office. 17 V.S.A. § 2539(a). Voters who request an Absentee Ballot due to illness, injury or disability receive their Absentee Ballots either by mail, electronic mail, or by personal delivery by a pair of Justices of the Peace (of different political parties). 17 V.S.A. §§ 2538, 2539(b). A voter may make a single application for Absentee Ballots for each election taking place in a single year, but a voter must make a new application each election year in which they wish to receive any Absentee Ballots. 17 V.S.A. § 2532(d).

19.     Voters who vote using an Absentee Ballot must sign a certificate bearing their name in which they swear or affirm that they are a legal voter of the town in which they cast their Absentee Ballot. 17 V.S.A. § 2542.

20.     The system the Vermont General Assembly has prescribed for the use of Absentee Ballots contains several features that safeguard the validity of the election by preventing fraudulent or otherwise dilutive votes:

a.     Under this statutory regime, the town clerk of each town is responsible for both issuing Absentee Ballots to voters who apply for them and receiving and tabulating those same Absentee Ballots after they are completed and returned by the voter. The town clerk is therefore aware in advance of the persons who are likely to vote using Absentee Ballots and is also aware whether a voter who arrives at the polling place in person on election day had previously requested an Absentee Ballot.

b.     Voters are required to proactively apply for an Absentee Ballot before an Absentee Ballot is issued to them, greatly reducing the risk that Absentee Ballots will be erroneously issued to voters who are no longer Vermont residents or who do not intend to vote by mail.

21.     These protections are particularly important for Vermont's elections because a large portion of those elections take place in rural districts consisting of only a few thousand voters. In several recent elections for seats in the General Assembly, the margin of victory has been less than 10 votes, with some elections being decided by a single vote. Even a small lapse in electoral

security may therefore result in a material dilution in Vermont citizens' constitutionally-protected voting rights. *See* Affidavit of Robert Frenier ¶ 2.

22.     The primary elections held in Vermont in August 2020 saw record turnout from Vermont voters, both in terms of the number of votes cast by Absentee Ballot and the number of votes cast overall. *See* Associated Press, *Preliminary results show record turnout for Vermont primary* (Aug. 13, 2020), https://apnews.com/f7ec72343a8281743eb394a91f67c99f.[1] The success of the August 2020 primary elections conclusively demonstrated the robustness of Vermont's existing statutory scheme for requesting and submitting Absentee Ballots.

23.     Each Plaintiff is an eligible and registered voter in the State of Vermont.  Each Plaintiff has regularly voted in prior Vermont state and federal elections, including each having voted in the last election for state Governor and  for U.S. President.

24.     Each Plaintiff plans and intends on voting in the upcoming November General Election to be held in Vermont.  Each plaintiff believe that this General Election can be held safely, with no additional health risk to any voter, under pre-existing Vermont election laws, which each Plaintiff understands allows any voter who desires an early absentee mail-in ballot to easily obtain, with no in-person appearance required.

---

[1] The Associated Press's article was based on preliminary results of "over 155,000" votes announced by Condos. The final, official turnout for the August primary was 174,242 votes cast. *See* Vt. Sec. of State, *Vermont Election Results: Official Results*, (last accessed Aug. 31, 2020), https://electionresults.vermont.gov/Index.html#/voterturnout.

25.    If the Directive is permitted to go into effect, and if General Election mail-in ballots are automatically distributed to every eligible voter (any voter on a voter check-list), without any request for such a ballot from that voter, many castable ballots will inevitably fall in the hands of persons other than the voter to whom the mail-in ballot was directed, including some mail-in ballots that will be sent to persons to have moved, died or otherwise become ineligible.

26.    Some or many of these misdirected or misreceived ballots can and will be cast by a person other than the voter to which the ballots were addressed or by an otherwise ineligible voter.  Each such miscast ballot will directly impact and dilute the individual vote of each legitimate Plaintiff voter, for which each Plaintiff will have no remedy once such miscast ballots are received and counted.

27.    The Directive's provisions for the unregulated return of mail-in ballots by persons other than the voter will compound and exacerbate the harm to and dilution of each Plaintiff's legitimate vote caused by the distribution of unrequested mail-in ballots.

28.    Each Plaintiff and each Plaintiff's individual legitimate vote in the November 2020 General Election will be directly, specifically and particularly impacted, harmed and diluted by the implementation of the Directive and by the mailing of unrequested mail-in ballots to each voter.

VERMONT GENERAL ASSEMBLY PASSES TEMPORARY ELECTIONS PROCEDURE LAW IN RESPONSE TO PANDEMIC

29.    On March 30, 2020, Vermont Governor Phil Scott ("Governor") signed H. 681 into law as Vermont Law No. 92 ("Act 92"). Act 92, which

explicitly referenced the Pandemic as the reason for its passage, provides, *inter alia*, for changes to Vermont's election procedures "for the purpose of protecting the health, safety, and welfare of voters, elections workers, and candidates in carrying out elections." *See* Act 92 §§ 1, 3.

30.   Act 92 was subsequently amended on June 26, 2020 through the passage into law, without the Governor's signature, of S. 348 as Vermont Law No. 135 ("Act 135").

31.   As relevant to the present action, Act 92 (as amended by Act 135) provides:

> Sec. 3. ELECTIONS IN THE YEAR 2020; SECRETARY OF STATE; GOVERNOR; TEMPORARY ELECTIONS PROCEDURES
>
> (a) In the year 2020, the Secretary of State is authorized, in consultation with the Governor, to order or permit, as applicable, appropriate elections procedures for the purpose of protecting the health, safety, and welfare of voters, elections workers, and candidates in carrying out elections, including:
>
>> (1) requiring mail balloting by requiring town clerks to send ballots by mail to all registered voters;
>>
>> (2) creating early or mail ballot collection stations;
>>
>> (3) permitting municipal clerks to process and begin counting ballots in a 30–day window preceding the day of an election;
>>
>> (4) permitting drive-up, car window collection of ballots by election officials;
>>
>> (5) extending the time for municipal clerks to process and count ballots; and
>>
>> (6) extending voting hours on the day of an election.
>
> (b) For any temporary elections procedure the Secretary of State orders or permits under this section, the Secretary shall adopt any

necessary corresponding procedures that ensure the public can monitor polling places and the counting of votes.

(c) If the Secretary of State orders or permits the mailing of 2020 General Election ballots to all registered voters pursuant to subsection (a) of this section, the Secretary shall:

    (1) inform the Governor as soon as reasonably practicable following the Secretary's decision to do so; and

    (2) require the return of those ballots to be in the manner prescribed by 17 V.S.A. § 2543 (return of ballots) as set forth in Sec. 1a of this act,[2] the provisions of which shall apply to that return.

### Defendant Issues Unconstitutional Directive That Contradicts Existing Vermont Law

32.    On July 20, 2020, Defendant issued the "First Statewide Elections Directive" ("Directive"), purportedly pursuant to the authority granted by Act 92 and Act 135. A true and correct copy of the Directive is attached hereto as **Exhibit 1**.

33.    The Directive illegally permits the processing of ballots returned by mail in the presence of election officials of only one party, in contravention of 17 V.S.A. §§ 2546(b) & 2584, which requires the participation of at least two election officials of different political parties. *See* Directive at 2.

---

[2] There is no "Sec. 1a" in either Act 92 or Act 135. On July 2, 2020, the Governor issued a letter addressed to the Vermont General Assembly noting this "cross-reference to a section of the bill that does not exist" and his attendant concern that this error "leav[es] the authority of the Secretary of State ambiguous as it relates to ballot returns." The Governor further stated this error was the reason he withheld his signature from Act 135. A true and correct copy of the Governor's July 2 letter to the Vermont General Assembly is attached hereto as **Exhibit 2**. This provision effectively makes it impossible for the Secretary of State to lawfully order or permit general election ballots to be mailed to all voters, as it is impossible for the Secretary of State to provide for the return of those ballots "as set forth in" a non-existent section of the relevant statutes.

34.    The Directive also illegally permits local Boards of Civil Authority ("BCAs") to change the location of polling places as late as 15 days prior to an election for any reason, in contravention of 17 V.S.A. § 2502(c) which prohibits changing the location of polling places within 30 days of an election except in case of emergency. *See* Directive at 3. The Directive also places the onus on each BCA to inform voters of these late changes in poll location, without mandating that a BCA give voters *any* notice to voters of the change. *See id.*

35.    The Directive provides that "[a] ballot will be mailed to every active voter on the statewide voter checklist."[3] Directive at 4. All voters on the statewide checklist are considered "active" unless their BCA has affirmatively challenged their residency in the town where they are registered to vote. *See id.*

36.    While Act 92 contemplated that the mass issuance of ballots by mail would be conducted by the town clerks, the Directive provides that these mailed ballots "will be mailed from a central location by the Secretary of State's Office." *Compare id. with* Act 92 § 3(a)(1).

37.    The Directive purported to override "any provisions of law contained in Title 17 of the Vermont Statutes Annotated to the contrary," and in fact conflicts with existing Vermont election law in several areas. The Directive is therefore *ultra vires* and contrary to the U.S. Constitution and Vermont Constitution.

---

[3] The statewide voter checklist is populated with the contents of the voter checklists maintained by the town clerk for each town in Vermont.

38.    The U.S. Constitution vests the power to determine the time, place and manner of federal elections in Vermont exclusively in the Vermont legislature.

39.    The Vermont Constitution vests the state's legislative power exclusively in the Vermont General Assembly, and specifically forbids the executive department of Vermont's government from exercising legislative power.

40.    Defendant, as an official of the executive department of the Vermont government, therefore has no power under the U.S. Constitution to set the time, place or manner of Vermont's federal elections, and also has no power to alter existing Vermont election law under the Vermont Constitution. Defendant purported to exercise both of these powers in issuing the Directive, and the Directive is therefore unconstitutional under both the U.S. Constitution and the Vermont Constitution.

41.    The issuance of the Directive was also *ultra vires* because no provision of Act 92, Act 135 or any other law imbued Defendant with the authority to issue regulations that contravene or override existing law. Even if, *arguendo*, the General Assembly could delegate to Defendant the power to make changes to existing Vermont election law (which it cannot do under the Vermont Constitution), it has not done so in this case.

CONDOS SENDS ABSENTEE BALLOT REQUEST POSTCARDS TO INCORRECT AND INVALID ADDRESSES

42.    After issuing the Directive, Condos caused absentee ballot request forms printed on postcards ("Postcards") to be sent to every person listed on the statewide voter checklist.

43.    The issuance of the Postcards was not provided for by the Directive or any provision of Vermont law, but was intended to be a test of the process by which Condos intended to mail ballots to all voters on the statewide voter checklist pursuant to the Directive.

44.    The mailing of the Postcards revealed numerous problems with Defendant's plan to mail ballots to every person appearing on the state's voter checklist.

45.    Postcards were sent to multiple voters at addresses they no longer used or at which they no longer resided, indicating the state's voter checklist is not up to date.

46.    Multiple voters were not sent a Postcard at all despite appearing on the voter rolls. Some of these voters have been registered to vote at the same address for decades.

47.    Postcards were sent to several people who are no longer eligible to vote in Vermont:

a.    A Postcard was sent to a former Vermont resident at a Florida address. After that voter contacted the town clerk for his former residence to remove his name from the voter rolls, he discovered his spouse also remained on the town's voter checklist despite having a Florida address.

b.     Former Vermont residents who now reside in New Hampshire received Postcards at their New Hampshire address despite previously making a written request to be taken off their former town's voter checklist.

c.     A former Vermont resident who had previously requested Absentee Ballots at several addresses due to his military service was sent a Postcard to an address in New York. The addressee had not been a valid Vermont voter since 2017 and had not resided at the New York address since 2006. The town clerk's office for this former resident should have been aware that this New York address was no longer valid because the former resident had successfully requested Absentee Ballots for at least three other addresses between 2006 and 2017.

48.     Some Vermont residents received Postcards addressed to former residents at their same address. Other voters received Postcards that were intended for another Vermont voter but that were sent to the incorrect address.

49.     Adding to the confusion, the Postcards are styled as "Request[s] for Early Absentee Voter Ballot" and provide a space for recipients to indicate whether they wish to receive an Absentee Ballot for the general election in November. There is no indication on the face of the Postcard that Defendant plans to send recipients a mail-in ballot regardless of whether they request an Absentee Ballot.

50.     The mishaps encountered in the course of sending the Postcards to Vermont voters illustrate the problems that will arise when Defendant attempts

to send mail-in ballots to Vermont voters. The Postcards were sent by the same means that Defendant proposes to use to send the mail-in ballots, and the Postcards were sent to the persons and addresses listed in the state's voter checklist, the same set of names and addresses that will be used to address the mail-in ballots.

51.   The problems illustrated by Defendant's attempt to send Postcards to every registered voter in Vermont are caused in large part by the over-inclusive method the Directive prescribes for determining who should receive a mail-in ballot. Under the Directive, every person appearing on the state voter checklist is to receive a mail-in ballot unless their voter registration is affirmatively challenged by their town's BCA. But under Vermont law, BCAs are not obligated to perform any investigation or due diligence of the persons listed on their voter checklists to ensure the addresses on their checklists are current or that the persons listed on the checklists remain qualified to vote in that town. As a result, and as demonstrated by Defendant's recent experience with the Postcards, town voter checklists (and by extension the statewide voter checklist) are woefully outdated and inaccurate. Because Defendant continues to rely on these inaccurate checklists to direct the mail-in ballots, mail-in ballots will be sent to persons who are not intended to receive them and not all valid Vermont voters will receive mail-in ballots intended for them.

THE DIRECTIVE VIOLATES PLAINTIFFS' RIGHTS BY ENABLING MASSIVE VOTER FRAUD IN VERMONT'S ELECTIONS

52.   The errors that will occur in sending mail-in ballots to voters under the Directive violates Vermont voters' constitutionally-protected rights by

creating arbitrary differences in the ease with which Vermont voters can vote in the November general election. As demonstrated by the recent experience with the Postcards, not all Vermont voters will receive a mail-in ballot despite being validly registered to vote in their town. Those Vermont voters who do not receive a mail-in ballot will be disadvantaged relative to voters who do receive a mail-in ballot.

53.     The mass mailing of mail-in ballots contemplated by the Directive also violates Vermont voters' constitutional rights by creating myriad opportunities for their votes to be diluted by illegally submitted ballots. As demonstrated by the recent experience with the Postcards, many people will receive mail-in ballots despite not being authorized to cast them, whether because those recipients are not valid Vermont voters at all or because the recipient received a mail-in ballot intended for another voter. The mass mailing of ballots contemplated by the Directive will therefore result in the creation of a large pool of ballots that are ripe for fraudulent use. These improperly-received ballots can easily be completed by the recipient or by a third party and the town that receives them would have few or no ways to verify that the ballot was completed by a valid Vermont voter or by the person whose name appears on the ballot's envelope.

54.     The risk of voter fraud is particularly acute because the Directive fails to provide any measures to restrict "ballot harvesting," a practice where organized groups,   usually politically-motivated third parties (campaign workers, political activists, paid personnel), go door-to-door and offer to collect

and turn in ballots for voters, in some cases 'helping' voters fill out their ballots in a way that aligns with the ballot harvester's political goals. "Ballot harvesting gives third parties who may be completely unknown to both the voter and election officials the opportunity to potentially tamper with absentee ballots." *See generally* Michael Morley, *Election Emergency Redlines*, at 25, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3564829 (last accessed Aug. 31, 2020).

55.    The Directive restricts ballot harvesting only by political candidates or "campaign staff members",[4] thus implicitly legalizing ballot harvesting by anyone who is not within these two categories including political parties, politically-aligned organizations, and even a candidate's family and friends. *See* Directive at 1.

56.    The Directive also ensures that any theoretical restriction on ballot harvesting will not be effectively enforced; the Directive explicitly states that local election officials *"shall not be required to enforce"* restrictions on ballot harvesting and are required only to "report any suspected violations" to the Secretary of State's office, who in turn will report them to the Attorney General's office for investigation. Directive at 1 (emphasis added). Any investigation the Attorney General's office undertakes will be fruitless, as any

---

[4] The Directive does not define "campaign staff member" and therefore leaves ambiguous who is prohibited from engaging in ballot harvesting. The only reference to "campaign staff" in Vermont election law is found in 17 V.S.A. § 2901, which provides in part, "'Candidate's committee' means the candidate's campaign staff, whether paid or unpaid."

such investigation will necessarily take place after the election and are unlikely to conclude before the votes are counted and the election results are certified.

57.   Upon information and belief, partisan political organizations are already planning door-to-door ballot harvesting campaigns in Vermont with the objective of unduly influencing the result of Vermont's General Election this year.

**COUNT I**
**Violation of the Fourteenth Amendment to the U.S. Constitution,**
**Vermont Constitution Chapter I, Article 8, and 42 U.S.C. § 1983**
**(Violation of Right to Vote)**

58.   All other allegations in this Complaint are realleged as if fully set forth herein.

59.   The Fourteenth Amendment to the U.S. Constitution protects citizens' right to vote, including their right to have the full value of their vote counted without any dilution or discount.

60.   Chapter I, Article 8 of the Vermont Constitution likewise protects the right of Vermont citizens to vote and to have free and uncorrupted elections.

61.   Defendant issued the Directive in his official capacity as Secretary of State of Vermont, purportedly in reliance on authority vested in the Secretary of State of Vermont by the Vermont General Assembly in Act 92 and Act 135. The Directive was therefore issued under color of state law.

62.   Defendant's Directive dilutes the votes of validly registered Vermont voters by creating and distributing a large number of mail-in ballots that are ripe for fraudulent use. Some of these mail-in ballots will be sent via

mail to persons who are not valid Vermont voters because Defendant has not provided for sufficient means to ensure the state voter checklist contains only current Vermont residents. Other mail-in ballots will be sent to persons other than the voter for whom they are intended because Defendant has not provided for sufficient means to ensure the state voter checklist contains only the current address for Vermont voters. In both cases, the recipient of these mail-in ballots (or another third party, such as a ballot-harvesting organization) can easily complete and return the mail-in ballot and thereby fraudulently submit a vote they are otherwise not permitted to cast under Vermont law, particularly because Defendant has provided for no means to ensure mail-in ballots are cast only by the valid Vermont voters for whom they are intended.

63.    Defendant's Directive also violate the voting rights of Vermont voters by arbitrarily placing some Vermont voters at an advantage relative to other Vermont voters. The mass mailing of mail-in ballots contemplated by the Directive will result in many mail-in ballots being mis-delivered or not delivered at all. As a result, some Vermont voters will receive mail-in ballots while some will not. Those Vermont voters who do not receive a mail-in ballot will suffer a disadvantage relative to those voters who do receive a mail-in ballot because voters who do not receive a ballot will have fewer means by which to vote. This disparity is especially burdensome in light of the ongoing Pandemic and the attendant risks of in-person voting.

64.    Defendants' violations of Plaintiff's rights are especially severe because, due to the small size of many Vermont towns and legislative districts

and the close margins that decide many Vermont elections, even a low incidence of fraudulent voting or small burdens imposed on Vermont voters' ability to cast their votes can materially affect the outcome of elections in Vermont.

65.    Absent relief from this Court, Plaintiffs will suffer irreparable harm to their voting rights as a result of Defendant's actions in promulgating the Directive and the actions Defendant will take in accordance with the Directive, particularly by distributing mail-in ballots via mass mail. Plaintiffs have no remedy at law for Defendant's violations of their right to have their votes count for their full, undiluted value.

66.    The harm to Plaintiffs' constitutionally-protected voting rights that Plaintiffs will suffer in the absence of relief outweighs any burden Defendant might suffer if the Court grants the relief Plaintiffs seek.

67.    The public interest favors granting the relief Plaintiffs seek, particularly given the Vermont Constitution provides "[t]hat all elections ought to be free and without corruption".

### COUNT II
**Violation of U.S. Constitution, Article I, Section 4 & Article II, Section I; Vermont Constitution, Chapter II, Section 5; and 42 U.S.C. § 1983 (Unconstitutional and *Ultra Vires* Use of Legislative Power)**

68.    All other allegations in this Complaint are realleged as if fully set forth herein.

69.    Defendant issued the Directive in his official capacity as Secretary of State of Vermont, purportedly in reliance on authority vested in the

Secretary of State of Vermont by the Vermont General Assembly in Act 92 and Act 135. The Directive was therefore issued under color of state law.

70.    The Directive purported to override "any provisions of law contained in Title 17 of the Vermont Statutes Annotated to the contrary," and therefore purports to change the requirements of Vermont law. In so doing, Defendant by issuing the Directive purports to exercise legislative powers vested in the Vermont General Assembly by the Vermont Constitution.

71.    The Directive conflicts with existing Vermont election law in several areas:

a.    The Directive permits the processing of ballots returned by mail in the presence of election officials of only one party, in contravention of 17 V.S.A. §§ 2546(b) & 2584, which requires the participation of at least two election officials of different political parties.

b.    The Directive permits BCAs to change the location of polling places as late as 15 days prior to an election for any reason, in contravention of 17 V.S.A. § 2502(c) which prohibits changing the location of polling places within 30 days of an election except in case of emergency.

c.    The Directive provides for mail-in ballots to be mailed by the Secretary of State's office to all voters who appear on the statewide voter checklist and whose registration is not subject to an active challenge from a BCA, in contravention of Vermont's Absentee Ballot laws, 17 V.S.A. § 2531 *et seq.*, which provide for Absentee Ballots to be distributed by town clerks only after receipt of a valid application for an Absentee Ballot.

72.    The U.S. Constitution vests the power to determine the time, place and manner of federal elections in Vermont exclusively in the Vermont legislature.

73.    The Vermont Constitution vests the state's legislative power exclusively in the Vermont General Assembly, and specifically forbids the executive department of Vermont's government from exercising legislative power.

74.    Defendant, as an official of the executive department of the Vermont government, therefore has no power under the U.S. Constitution to set the time, place or manner of Vermont's federal elections, and also has no power to alter existing Vermont election law under the Vermont Constitution. Defendant purported to exercise both of these powers in issuing the Directive, and the Directive is therefore unconstitutional under both the U.S. Constitution and the Vermont Constitution.

75.    The issuance of the Directive was also *ultra vires* because no provision of Act 92, Act 135 or any other law imbued Defendant with the authority to issue regulations that contravene or override existing law. Even if, *arguendo*, the General Assembly could delegate to Defendant the power to make changes to existing Vermont election law (which it cannot do under the Vermont Constitution), it has not done so in this case.

76.    Absent relief from this Court, Plaintiffs will suffer irreparable harm to their voting rights as a result of Defendant's actions in promulgating the Directive and the actions Defendant will take in accordance with the Directive,

particularly by distributing mail-in ballots via mass mail. Plaintiffs have no remedy at law for Defendant's violations of their right to have their votes count for their full, undiluted value.

77.     The harm to Plaintiffs' constitutionally-protected voting rights that Plaintiffs will suffer in the absence of relief outweighs any burden Defendant might suffer if the Court grants the relief Plaintiffs seek.

78.     The public interest favors granting the relief Plaintiffs seek, particularly given the Vermont Constitution provides "[t]hat all elections ought to be free and without corruption".

**COUNT III**
### Violation of Act 95, Act 135, and 42 U.S.C. § 1983
### (*Ultra Vires* Promulgation of Arbitrary and Unreasonable Directive)

79.     All other allegations in this Complaint are realleged as if fully set forth herein.

80.     Defendant issued the Directive in his official capacity as Secretary of State of Vermont, purportedly in reliance on authority vested in the Secretary of State of Vermont by the Vermont General Assembly in Act 92 and Act 135. The Directive was therefore issued under color of state law.

81.     Act 92 and Act 135 permit Defendant as Secretary of State to issue "appropriate elections procedures" only "for the purpose of protecting the health, safety, and welfare of voters, elections workers, and candidates in carrying out elections". *See* Act 92 § 3(a); Act 135 § 1(a).

82.     The Directive does not protect the health, safety or welfare of Vermont's voters, elections workers or candidates. The procedures provided for

in the Directive provide no health benefits to any participant in Vermont's elections over and beyond the existing statutory scheme for the issuance and use of Absentee Ballots. The record voter turnout during the August 2020 primary election in the face of the ongoing Pandemic confirms that the existing Absentee Ballot procedures adequately provide for the safe and efficient conduct of Vermont elections.

83.     Defendant's issuance of the Directive is *ultra vires* because it was promulgated outside the conditions imposed by Vermont law in Act 92 and Act 135. The Directive creates mischief and the opportunity for fraud with no countervailing benefit to the health, safety or welfare of any voters, election workers, or candidates in Vermont elections.

84.     Absent relief from this Court, Plaintiffs will suffer irreparable harm to their voting rights as a result of Defendant's actions in promulgating the Directive and the actions Defendant will take in accordance with the Directive, particularly by distributing mail-in ballots via mass mail. Plaintiffs have no remedy at law for Defendant's violations of their right to have their votes count for their full, undiluted value.

85.     The harm to Plaintiffs' constitutionally-protected voting rights that Plaintiffs will suffer in the absence of relief outweighs any burden Defendant might suffer if the Court grants the relief Plaintiffs seek.

86.     The public interest favors granting the relief Plaintiffs seek, particularly given the Vermont Constitution provides "[t]hat all elections ought to be free and without corruption".

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

1.    The Court find and declare that the Directive is unconstitutional, *ultra vires,* and contrary to law; and

2.    The Court enter an injunction rescinding the Directive and preventing Defendant from distributing mail-in ballots via mass mailing to all persons listed on the statewide voter checklist as contemplated by the Directive.

Dated: September 4, 2020                    Respectfully submitted,

Deborah T. Bucknam, Esq.
BUCKNAM LAW, P.C.
434 Eastman Road
Walden, Vermont 05836
Phone: (802) 748-5525
Facsimile: (802) 748-4888
DBucknam@vtlegalhelp.com

David A. Warrington (VSB No. 77293)
(pro hac vice to be applied for)
KUTAK ROCK LLP
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219
Phone: (202) 828-2437
Facsimile: (202) 828-2488
david.warrington@kutakrock.com

Harmeet K. Dhillon, Esq.
(pro hac vice to be applied for)
Dhillon Law Group, Inc.
177 Post St., Suite 700
San Francisco, CA 94108
415-433-1700
harmeet@dhillonlaw.com
*Attorneys for Plaintiffs*
*Tracey Martel, Robert Frenier, Brian Smith,*
*Raoul Beaulieu and Mary Beausoleil*